IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| CAROLINE MAY )<br>aka CAROLINE HALL )<br> )<br>and )<br> )<br>BENJAMIN MATTHEW-BLAKE HALL )<br>fka BENTLEY BLAKE ALEXANDER HALL )<br> )<br>Plaintiffs, )<br> )<br> )  **COMPLAINT**<br>v. )<br> )  **DEMAND FOR JURY TRIAL**<br>M.R. ASSOCIATES, L.P. )<br>t/a Marsh Run Mobile Home Community )<br>t/a Marsh Run MHC; and )<br>STACY WEST )<br> )<br>Defendants. )<br> ) | |

**COMPLAINT**

Plaintiffs CAROLINE MAY aka CAROLINE HALL and BENJAMIN MATTHEW-BLAKE HALL fka BENTLEY BLAKE ALEXANDER HALL (hereinafter, "Plaintiffs"), bring this Complaint by and through the undersigned counsel, against Defendants M.R. ASSOCIATES, L.P. t/a Marsh Run Mobile Home Community t/a Marsh Run MHC (hereinafter, "Marsh Run") and STACY WEST (hereinafter, "West"), property manager of Marsh Run MHC, and allege as follows.

**INTRODUCTION**

1. Plaintiffs bring this action seeking redress for Defendants' unlawful discrimination and retaliation against Plaintiffs in connection with their housing and rental agreement, and

1

for failure to provide reasonable accommodations for Plaintiffs' disabilities. Defendants' actions thus violated the Federal Fair Housing Act, 42 U.S.C. §3601, et seq, as well as the Virginia Fair Housing Law, Va Code §36-96.1, et seq., and the Virginia Manufactured Home Lot Rental Act, Virginia Code §55.1-1300, et seq as well as constituted an unlawful conversion and trespass.

2. Plaintiffs are seeking actual and punitive damages, and declaratory and injunctive relief, as well as attorney fees.

## JURISDICTION AND VENUE

3. The Court has jurisdiction over this action under 28 U.S.C. §1331, 42 U.S.C. §3613 and Virginia Code §36-96.18. The Court also has pendent jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367(a).

4. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2), as the actions complaint of occurred in this district.

## PARTIES

5. Plaintiffs are natural persons and resident of the Commonwealth of Virginia.

6. Plaintiffs are "aggrieved persons" as defined by 42 U.S.C. §3602 and Virginia Code §36-96.1:1.

7. Defendant Marsh Run is a Limited Partnership with a primary business location at 31550 Northwestern Highway, S 200, Farmington Hills, MI 48018.

8. Defendant Marsh Run manages a Manufactured Home Community located in Bealeton, Virginia (the "Community").

9. Defendant Marsh Run leases lots in the Community to individuals, for them to place residential trailers/manufactured homes on to live in.

10. Defendant West manages the Community for Defendant Marsh Run.

**FACTS**

11. On or about March 19, 2013, Plaintiff Caroline Hall ("Plaintiff Caroline") entered into a lease agreement with Marsh Run for the lease of a lot at the Community. A copy of the Lease is attached hereto as Exhibit 1.

12. On or about March 19, 2013, Plaintiff Caroline placed her trailer and began living in it.

13. Plaintiff Caroline's trailer is a "manufactured home" as that term is defined by Virginia Code §55.1-1300, in that it is a structure, transportable in one or more sections, that in the traveling mode is eight body feet or more in width or 40 body feet or more in length, or when erected on site, is 320 or more square feet, and that is built on a permanent chassis and designed to be used as a dwelling with or without a permanent foundation when connected to the required utilities, and includes the plumbing, heating, air-conditioning, and electrical systems contained in the structure.

14. The Community is a "manufactured home park" as defined by Virginia Code §55.1-1300, in that it is a parcel of land under single or common ownership up0on which five or more manufactured homes are located on a continual, nonrecreational basis, and includes structures, equipment, roads or facilities intended for use incidental to the occupancy of the manufactured homes.

15. The lot leased to Plaintiff Caroline is a "manufactured home lot" as defined by Virginia Code §55.1-1300, in that it is a parcel of land within the boundaries of a manufactured home park provided for the placement of a single manufactured home and the exclusive use of its occupants.

16. In or about April 2020, Plaintiff Bentley Hall ("Plaintiff Bentley") moved into the

premises with Plaintiff Caroline

17. In or about October 2020, Plaintiff Bentley married Plaintiff Caroline.

18. Plaintiff Bentley's birth gender is female, but his gender identity is Male.

19. Subsequent to October 2020, Plaintiff Bentley began hormone replacement therapy and related treatment to align his physical gender with his gender identity.

20. Once the physical transformation to male began to become apparent, Defendants began to discriminate against Plaintiffs, treating them differently from other residents, attempting to selectively enforce regulations against them, and denying them rights and privileges they were entitled to under the law, as set forth below.

21. Plaintiff Bentley has a mental impairment that substantially limits his major life activities.

22. As a result of his impairment, Plaintiff Bentley has four emotional support animals.

23. Plaintiff Bentley receives counseling and treatment from various mental health professionals, who have confirmed his need for all four emotional support animals, who all provide unique support for different aspects of Plaintiff Bentley's life.

24. Marsh Run has community rules and regulations that limit residents to one animal companion per unit.

25. Marsh Run does not routinely enforce its rules and regulations which limit residents to on animal companion per unit, and routinely allow residents to have as many animal companions as they desire.

26. Buddy Noel and Sandra Noel (the Noels) leased a lot from Defendant Marsh Run. This lot neighbored Plaintiffs' lot.

27. Once Plaintiff Bentley Hall's physical transformation became apparent, the Noels began

to harass Plaintiffs for being members of the LGBTQ community, called them names, and started a campaign to attempt to drive them out of the community.

28. The Noels referred to Plaintiff Bentley as "tranny" and "it."

29. Among other things, the Noels began making frivolous calls to animal control falsely claiming that the Plaintiffs' dogs were out of control, barking and created disturbances.

30. The Noels made similar complaints to the Defendants.

31. On every occasion that animal control came out to investigate the Noels' complaints, they determined that the complaint was unfounded and observed that the dogs were not disruptive or barking

32. Animal control offered to wait in the Noels' trailer to observe if the dogs became disruptive, but the Noels refused.

33. Marsh Run was aware that each and every complaint to animal control came back unfounded.

34. The Plaintiffs' dogs were not in fact disruptive and rarely, if ever barked.

35. The Noels' motivation for these complaints and the harassment was that Plaintiff Bentley Hall was now noticeably Transgender.

36. Plaintiffs complained to Defendants about the Noels' harassment and discriminatory actions.

37. In response, Defendant Marsh Run, by and through its property manager, Stacy West, told Plaintiffs that they should just learn to live with it, since the Noels were elderly and would not change and that Defendants would not be taking any action against the Noels.

38. On or about October 8, 2021, in response to Plaintiffs' complaints to Defendants regarding the Noels' harassment and discriminatory actions, Defendants sent Plaintiffs a

5

Notice of Guideline Violation, seeking to hold Plaintiffs in violation of the Community Rules and Regulations for having four unregistered dogs, having dogs allegedly disturbing neighbors, having more than one pet in the household, failing to clean up defecation, and failing to confirm all members of the household.  A copy of the Notice of Violation is attached hereto as Exhibit 2.

39. The alleged violations were fabricated and untrue.

40. Defendants charged Plaintiffs with the alleged violations as retaliation for complaining about the Noels and due to Plaintiff Bentley being transgender.

41. Plaintiffs had previously notified Defendants that Plaintiff Bentley was living at Plaintiffs' residence, and had submitted an application for occupancy to Defendants.

42. Defendants had previously approved Plaintiff Bentley's application for occupancy.

43. As noted above, the dogs were not in fact noisy and unruly, but instead this claim was part of a targeted and discriminatory harassment by the Noels.

44. Rather than investigate the claim that the dogs were noisy and unruly, Defendants adopted and participated in the Noels' targeted discrimination which had no basis in fact.

45. Plaintiffs had also previously advised Defendants that their four dogs were emotional support animals for Plaintiff Bentley.

46. In fact, on October 8, 2021, prior to Defendants issuing its Notice of Guideline Violation, Plaintiffs had provided Defendants with a Medical Release and Reasonable Accommodation Request Verification for all four dogs.

47. On October 11, 2021, Plaintiffs submitted a second Medical Release and Reasonable Accommodation Request Verification for all four dogs.

48. Plaintiffs further provided Defendants four letters/emails (one for each dog) dated

    September 25, 2021 from his Licensed Clinical Neuropsychologist explaining that each dog was a necessary emotional support animal for Plaintiff Bentley.

49. Plaintiffs also provided Defendants with an October 28, 2021 letter from Plaintiff Bentley's LCSW describing that he benefits from all four of his dogs as emotional support animals.

50. Plaintiffs also provided Defendants with several letters, dated December 29, 2021 and January 2, 2022, from Plaintiff Bentley's Clinical Neuropsychologist, explaining that each of the dogs was a necessary emotion support animal for Plaintiff Bentley.

51. On January 3, 2022, Defendants denied Plaintiffs' request for a reasonable accommodation to allow all four of his dogs to remain as emotional support animals.

52. Instead, Defendants made the arbitrary and unilateral decision, without any medical authority or support, that Plaintiff Bentley only needed one dog as an emotional support animal.

53. Plaintiffs again provided Defendants two letters, dated February 20, 2022 and March 17, 2022, from Plaintiff Bentley's Clinical Neuropsychologist, again explaining that each of the dogs was a necessary emotion support animal for Plaintiff Bentley.

54. Plaintiffs then provided Defendants two more letters, dated March 21, 2022, from Plaintiff Bentley's LMSW, again explaining that each of the dogs was a necessary emotion support animal for Plaintiff Bentley, and detailing the reasons that each dog was necessary.

55. In response, on April 1, 2022, Defendants provided a purported 30 Day Lease Termination Notice, a copy of which is attached hereto as Exhibit 3.

56. In the Lease Termination Notice, Defendants again claims that Plaintiffs have violated

the lease by keeping four dogs, and deny his request for reasonable accommodations.

57. In the Lease Termination Notice, Defendants also purports to terminate the lease as an expired lease on a 30 day notice, and falsely claims the lease is month to month.

58. The Lease is governed by the Virginia Manufactured Home Lot rental Act (MHLRA), Virginia Code §55.1-1300, et seq.

59. Under the MHLRA, rental agreement is automatically renewed on a year to year basis, unless a 60 day notice of non renewal is provided prior to the expiration of the lease. See Virginia Code §55.1-1302(B).

60. The rental agreement cannot contain provisions contrary to the MHLRA, and any attempt to circumvent tenant rights found in the MHLRA are void and enforceable. See Virginia Code §55.1-1301 (A); §55.1-1308(A); §55.1-1311; §55.1-1208.

61. Thus, when the lease expired on February 28, 2015, it renewed for another year and has renewed yearly every year since. The current lease expiration is February 28, 2023.

62. Despite this, Defendants sent a notice purporting to and threatening to terminate the lease mid term on a 30 day notice.

63. In the Lease Termination Notice, Defendants also purported to terminate the lease because Plaintiff Bentley was living in the premises prior to being approved by the Community for residency.

64. For over a year, prior to Plaintiff Bentley's gender change became visibly apparent, Defendants did not have any objection to Plaintiff Bentley residing at the premises, and in fact had approved his Application for Occupancy.

65. Further, Plaintiff Caroline was a tenant and was free to have guests or invitees (and her spouse) at her home, and Defendants is prohibited from restricting this access. See

Virginia Code §55.1-1306(B).

66. Even if Plaintiff Bentley was required to obtain approval to live with his wife in her home, and he had not already sought and obtained approval, that is not a basis for eviction under Virginia Code §55.1-1315.

67. Pursuant to Virginia Code §55.1-1315, the management of a Manufactured Home Lot can only evict a tenant for nonpayment of rent; violation of a building or housing code caused by lack of reasonable care by the tenant, a member of the tenant's household, or a guest or invitee of the tenant; a violation of law or ordinance that is detrimental to the health, safety and welfare of other tenants; a violation of a rule materially affecting the health, safety and welfare of anyone; or multiple violations of the rental agreement within a 6 month period.

68. A failure to obtain residency approval prior to moving in to the residence does not meet any of the criteria under Virginia Code §55.1-1315.

69. The Lease Termination Notice falsely threatens Plaintiffs that their personal property will be disposed of within a 24 hour period after the lease "terminates" on May 2, 2022.

70. However, not only does the lease not terminate on May 2, 2022, as set forth above, but even if it was terminated and the Plaintiffs were evicted, pursuant to Virginia Code §55.1-1316, Plaintiffs would have 90 days to sell the manufactured home or remove the home from the park after eviction.

71. The threat to dispose of Plaintiffs' personal property within 24 hours after May 2, 2022 was intended to create a false sense of alarm and urgency to force Plaintiffs to vacate the premises.

72. The Lease Termination Notice also purports to terminate the lease because Plaintiffs have

more pets than is allowed.

73. As set forth above, Defendants routinely ignores the maximum pet requirement in the Manufactured Home Lot, and allows other residents to keep multiple pets, including at lease one who breeds and sells their dogs.

74. Defendants' selective enforcement of the restriction on the number of pets is targeted to Plaintiffs and discriminates against Plaintiffs.

75. Due to its selective enforcement, the restriction on the number of pets is unenforceable against Plaintiffs, pursuant to Virginia Code §55.1-1228 (A)(3).

76. Even if the restriction on the number of pets was not being selectively enforced against Plaintiffs, the restriction violates Virginia Code §55.1-1228(A).  Since the tenants own the trailers, and all that is being rented is a lot, there is no rational purpose related to a legitimate landlord need to restrict the number of pets.  The wear and tear on a trailer from multiple pets would affect the resident, not the Community owner.  The restriction's purpose would not promote the convenience, safety or welfare of tenants, preserve the landlord's property from abusive use, or affect the distribution of services and facilities available to tenants and it is not reasonable related to the purpose of the Virginia Residential Landlord Tenant Act (VRLTA), Virginia Code §55.1-1200, et seq.

77. Further, even if the restriction were otherwise generally enforceable, when a resident has a documented need for emotional support animals, Virginia's Fair Housing Law and the Federal Fair Housing Act override the restriction.

78. As set forth above, Plaintiffs provided extensive medical documentation that Plaintiff Bentley required all four of his dogs as emotional support animals.

79. The Lease Termination Notice also claimed that the Plaintiffs' dogs were causing a

disruption to the community.

80. As set forth above, this allegation was untrue and unsubstantiated.

81. In addition, there are numerous other dogs in the community that bark incessantly and who roam freely without leashes, defecating where they will.

82. Defendants have not attempted to impose any restriction or penalty on the owners of the other dogs in the community who do in fact bark incessantly or who roam freely without leashes.

83. Defendants are thus once again selectively enforcing its rules and regulations against Plaintiffs, in a targeted, discriminatory and retaliatory manner.

84. Defendants' selective enforcement of its rules and regulations described above is targeted at Plaintiffs due to their gender identity and sexual orientation.

85. Defendants' selective enforcement of its rules and regulations was pretextual and an attempt to camouflage for their discriminatory practices.

86. Four days after sending its Lease Termination Notice, Defendants turned off the water to Plaintiffs' residence and sent workers to tear up their yard

87. Plaintiffs questioned Defendants as to why they were tearing up their yard.

88. Defendants told Plaintiffs that it was to repair a septic issue.

89. Plaintiffs had been complaining about the septic issue for years, with no curative action taken by Defendants.

90. Defendants did not send any advance notice of the repairs or intent to turn off the water.

91. The timing of the "repairs" and lack of notice to Plaintiffs indicate that the tearing up of their yard and turning off the water was retaliatory and punitive, and was designed as a means to try to force Plaintiffs out of the property, in furtherance of their discriminatory

actions described above.

92. Defendants ordered the "repairs" as retaliation for Plaintiffs' filing a complaint with Fair Housing.

93. As a result of Defendants' actions and threats described above, Plaintiffs felt threatened and forced to sell their trailer in order to escape the hostile environment Defendants had created.

94. Plaintiffs therefore sold their trailer for less than market value in order to move out of the Community as quickly as possible.

95. As a result of the Defendants' actions described above, the Plaintiffs have incurred damages, including attorney fees, anxiety, stress, embarrassment, aggravation, reputational harm, and monetary damages from the sale of their trailer.

## COUNT I

## VIOLATIONS OF THE FAIR HOUSING ACT

## 42 U.S.C. § 3601, et seq.

96. The allegations in paragraphs 1 through 95 are re-alleged and incorporated herein by reference.

97. The lot which Plaintiffs rent from Defendant Marsh Run is a "dwelling" as defined by 42 U.S.C. §3592(b), in that it is land that is offered for lease for the location of a residential structure - to wit, a manufactured home.

98. Plaintiffs are "aggrieved persons" as defined by 42 U.S.C. §3592(I) in that they claim to have been injured by a discriminatory housing practice and believe that they will be injured by a discriminatory housing practice that is about to occur.

99. Plaintiff Bentley is a person with a "handicap" as defined by 42 U.S.C. §3592(h), in that

he has a mental impairment that substantially limits one or more of his major life activities.

100. Defendants' actions described above violate 42 USC § 3604(b) in that they discriminate against Plaintiffs because of their sex, sexual orientation and gender identity.

101. Defendants' actions described above violate Virginia 42 USC § 3604(f) in that they discriminate against Plaintiffs because of Plaintiff Bentley's handicap.

102. Defendants' actions described above evince a refusal to make reasonable accommodations in rules, practices, policies or services when such accommodations may be necessary to afford Plaintiff Bentley an equal opportunity to use and enjoy a dwelling.

103. As set forth above, Plaintiffs requested reasonable accommodations be made for Plaintiff Bentley's four emotional support animals.

104. Plaintiffs' request for reasonable accommodations did not impose an undue financial and administrative burden on Defendants.

105. Plaintiffs' request for reasonable accommodations did not impose a fundamental alteration to the nature of the Defendants' operations.

106. Notwithstanding the above, Defendants refused Plaintiffs' request for reasonable accommodations for Plaintiff Bentley's emotional support animals.

107. Plaintiffs have been injured by Defendants' violations described above.

108. Defendants' actions were in willful, wanton, malicious and reckless for Plaintiffs' rights.

109. By reason the above, Defendants are liable to Plaintiffs for actual damages, punitive damages, costs and attorneys' fees, as well as an injunction and a restraining order enjoining Defendants from engaging in the above practices.

**COUNT II**

## VIOLATIONS OF THE VIRGINIA FAIR HOUSING LAW

## VIRGINIA CODE §36-96.1, et seq.

110. The allegations in paragraphs 1 through 109 are re-alleged and incorporated herein by reference.

111. Plaintiffs are "aggrieved persons" as defined by Virginia Code §36-96.1:1 in that they claim to have been injured by a discriminatory housing practice and believe that they will be injured by a discriminatory housing practice that is about to occur.

112. Plaintiff Bentley is a person with a "disability" as defined by Virginia Code §36-96.1:1, in that he has a mental impairment that substantially limits one or more of his major life activities.

113. Plaintiff Bentley's emotional assistance animals described above are "Assistance animals" as defined by Virginia Code §36-96.1:1, in that they provide assistance and perform tasks for a person with a disability, to wit, Plaintiff Bentley, and further they provide emotional support that alleviates one or more identified symptoms or effects of Plaintiff Bentley's disability.

114. The lot which Plaintiffs rent from Defendants is a dwelling as defined by Virginia Code §36-96.1:1, in that it is land that is offered for lease for the location of a residential structure - to wit, a manufactured home.

115. Defendants' actions described above violate Virginia Code §36-96.3 (2) in that they discriminate against Plaintiffs because of their sexual orientation and gender identity.

116. Defendants' actions described above violate Virginia Code §36-96.3 (9) in that they discriminate against Plaintiffs because of Plaintiff Bentley's disability.

117. Defendants' actions described above evince a refusal to make reasonable

accommodations in rules, practices, policies or services when such accommodations may be necessary to afford Plaintiff Bentley an equal opportunity to use and enjoy a dwelling.

118. As set forth above, Plaintiffs requested reasonable accommodations be made for Plaintiff Bentley's four emotional support animals.

119. Plaintiffs' request for reasonable accommodations did not impose an undue financial and administrative burden on Defendants.

120. Plaintiffs' request for reasonable accommodations did not impose a fundamental alteration to the nature of the Defendants' operations.

121. Notwithstanding the above, Defendants refused Plaintiffs' request for reasonable accommodations for Plaintiff Bentley's emotional support animals.

122. Plaintiffs have been injured by Defendants' violations described above.

123. Defendants' actions were in willful, wanton, malicious and reckless for Plaintiffs' rights.

124. By reason the above, Defendants are liable to Plaintiffs for actual damages, punitive damages, costs and attorneys' fees, as well as an injunction and a restraining order enjoining Defendants from engaging in the above practices.

## Count III: VIOLATION OF THE MANUFACTURED HOME LOT RENTAL ACT
## Virginia Code §55-1300, et seq

125. The allegations in paragraphs 1 through 124 are re-alleged and incorporated herein by reference.

126. Defendant Marsh Run is a "landlord" as defined by Virginia Code §55.1-1300, in that it is the owner of the manufactured home park, or it is the operator of said park and has failed to disclose the name of said owner in a manner prescribed by Virginia Code §55.1-1216.

127. The Plaintiffs' lease is a year to year lease, with a current expiration date of February 28, 2023.

128. Defendants have sent the Lease Termination Notice purporting to abridge the lease expiration on a mid term 30 day notice. This violates Virginia Code §55.1-1302(B).

129. The Lease Termination Notice's threat that an personal property left in the premises will be disposed of within 24 hours after termination (i.e., May 2, 2022) violates Virginia Code §55.1-1316.

130. Defendants' selective enforcement of its pet policy against Plaintiffs violates Virginia Code §55.1-1228, which is incorporated into the MHLRA pursuant to Virginia Code §55.1-1311.

131. In addition, Defendants' pet policy violates Virginia Code §55.1-1228(A), irrespective of whether it was being selectively enforced. Specifically, since all Defendants are leasing to tenants is a lot, and tenants are providing the building, a limit on the number of pets does not promote the convenience, safety or welfare of tenants, preserve the landlord's property from abusive use, or affect a fair distribution of services and facilities held out for tenants generally. Any wear and tear that extra pets caused would be inside the tenant's property, and thus a limitation on pets would not meet the requirements of Virginia Code §55.1-1228(A).

132. Defendants' turning off of the water to the premises and tearing up the Plaintiff's yard as described above violates Virginia Code §55.1-1303 and 1314.

133. Defendants' actions against Plaintiff's premises were in retaliation for Plaintiff's complaint to Fair Housing.

134. Plaintiffs have been damaged as a result of Defendants' actions

135. As a result of Defendants' breaches described above, Plaintiffs are entitled to the greater of actual damages or the monthly rental payment, together with reasonable attorney fees, pursuant to Virginia Code §55.1-1318.

### Count IV: UNLAWFUL OUSTER

136. The allegations in paragraphs 1 through 135 are re-alleged and incorporated herein by reference.

137. Defendants' actions described above, including the turning off of the water and tearing up of the yard, constitute an ouster of Plaintiffs from their rental unit.

138. As a result, Plaintiffs have been damaged.

139. Defendants' actions were in willful, wanton, malicious and reckless disregard of Plaintiffs' rights.

### Count V: CONSTRUCTIVE EVICTION

140. The allegations in paragraphs 1 through 139 are re-alleged and incorporated herein by reference.

141. Defendants' actions described above constitute constructive eviction of Plaintiffs from their rental unit.

142. As a result, Plaintiffs have been damaged.

143. Defendants' actions were in willful, wanton, malicious and reckless disregard of Plaintiffs' rights.

### DEMAND FOR TRIAL BY JURY

144. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby requests a trial by jury on all issues so triable.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demands judgment against Defendants as follows:

A. Awarding Plaintiffs statutory damages;

B. Awarding Plaintiffs actual damages;

C. Awarding Plaintiffs punitive damages;

D. Declaratory and injunctive relief;

E. Awarding Plaintiffs costs of this Action, including reasonable attorneys' fees and expenses;

F. Awarding pre-judgment interest and post-judgment interest; and

G. Awarding Plaintiffs such other and further relief as this Court may deem just and proper.

Date: August 29, 2022

Respectfully Submitted,
CAROLINE MAY aka CAROLINE HALL
BENJAMIN MATTHEW-BLAKE HALL
fka BENTLEY BLAKE ALEXANDER HALL

By: /s/ Thomas R. Breeden
Thomas R. Breeden, Esquire/VSB#33410
Thomas R. Breeden, P.C.
10326 Lomond Drive
Manassas, Virginia 20109
Telephone No.: (703) 361-9277
Facsimile No.: (703) 337-0441
Email: trb@tbreedenlaw.com
Counsel for Plaintiff

By: /s/ Brian L. Bromberg
Brian L. Bromberg, Esquire
Bromberg Law Office, P.C.
352 Rutland Road, #1
Brooklyn, New York 11225
Telephone No.: (212) 248-7906
Facsimile No.: (212) 248-7908
Email: brian@bromberglawoffice.com
(*Pro Hac Vice* to be filed)